UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| ILD CORP. | CASE NO.: 6:17-bk-03506-PMG |
| ILD HOLDINGS, INC. | CASE NO.: 6:17-bk-03507-PMG |
| ILD TELESERVICES, INC. | CASE NO.: 6:17-bk-03508-PMG |
| INTELLICALL OPERATOR SERVICES, INC. | CASE NO.: 6:17-bk-03510-PMG |
| Debtors. | |

## CHAPTER 11 CASE MANAGEMENT SUMMARY

ILD Corp. ("ILD"), ILD Holdings, Inc. ("Holdings"), ILD Teleservices, Inc. ("Teleservices"), and Intellicall Operator Services, Inc. ("Intellicall") (collectively, the "Debtors"), debtors and debtors-in-possession in the above captioned cases, file this Chapter 11 Case Management Summary in accordance with Local Rule 2081-1(b), and state as follows:

On September 29, 2017 (the "Petition Date"), each of the Debtors filed petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Due to the interrelated nature of the Debtors' respective businesses, the Debtors are seeking joint administration of their respective bankruptcy cases. No trustee has been appointed. The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession under §§ 1107 and 1108 of the Bankruptcy Code.

## I. Description of the Debtors' Businesses

### A. Overview.

Prior to the Petition Date, the Debtors owned and operated three separate lines of business: (1) a conferencing services business, (2) a customer support services business, and (3) a payment processing business. The assets related to these business lines are subject to a first priority blanket lien in favor of Bank of America, N.A. ("BOA"). In June 2013, the Debtors defaulted under various loan agreements with BOA. Thereafter, on November 5, 2013, the Debtors and BOA entered into the first of several forbearance agreements regarding the outstanding amounts owed by the Debtors to BOA. In January of 2017, BOA informed the Debtors that it would not agree to extend any forbearance agreement beyond May 1, 2017.

After learning that BOA would not agree to extend a forbearance past May 1, 2017, the Debtors developed a plan to liquidate portions of its business lines in connection with an overall restructure of the company. The Debtors retained Thomas Santoro of GlassRatner Advisory & Capital Group, LLC to explore sale alternatives for the Debtors' various business lines. On June 30, 2017, the Debtors sold their conferencing services business to American Teleconferencing Services, Ltd. for $3,700,000 and paid the net proceeds from the sale to BOA. The Debtors also explored potential sale alternatives related to the customer support services business, but were unable to generate significant interest in that business line due the size of the transaction and the loss of several key customers of the business. Unable to find a purchaser for the customer support services business line, the Debtors had no choice but to start the wind down of that portion of its business.

Following the sale of the conferencing services business and the wind down of the customer support services business, the Debtors only operational business line as of the Petition Date is the payment processing business. Under the payment processing business, the Debtors act as a "billing aggregator" that facilitate billing and collections on behalf of smaller telecommunications companies by aggregating all of their billing transactions and submitting them to the various local exchange carriers (known as "LECs"), such as AT&T and Verizon, in a form that enables the LECs to bill the charges to the users of telephone services on their monthly LEC bill.

### B. Description of the Debtors' Ongoing Operations.

In the pre-subscribed long distance telephone business, typically the service provider – the LEC- establishes a long-term services relationship with the consumer. In contrast, some smaller telecommunications companies provide services, known as "alternative operator services" ("AOS") that compete with the LECs in niche areas such as hotels and prisons. AOS generally involves a less formal relationship. A consumer may use an AOS provider's assets or services without the consumer or the AOS provider knowing at that time each other's identity. For example, an AOS provider owning the service contract for a hotel chain will generally not know the identity of the consumer using its phone. When a collect call is placed, often the only information that the AOS provider has are the basic elements of the call itself, such as the telephone number the call is placed from, the telephone number the call is placed to, the date and time of the call, and the duration of the call.

After the receiving party accepts the charges, the AOS provider can generally only bill that party by one of two methods: (1) using a direct invoice; or (2) an agreement with the consumer's home LEC. The first option is generally undesirable for a number of reasons, such as relatively

3

high administrative expense costs. The second option can also be cost-prohibitive because each LEC requires specialized billing and collection agreements in order to place charges on a consumer's LEC bill. Obtaining and maintaining contractual relationships with the various LECs is generally very expensive, as is interfacing with each LECs' billing system and the resulting reports and data streams.

These AOS providers - and other similar service companies offering enhanced telephone services such as bundled calling plans - are the Debtors' customers (the "Service Providers"). The Debtors enter into contracts with the Service Providers to aggregate all of the Service Providers' billing transactions and submit them to the various LECs in a form that enables the LECs to bill the charges to the end user. To accomplish this, the Debtors maintain billing and collection agreements with many of the major LECs in the United States.

Once the Debtors obtain billing transactions from the Service Providers and submit them to the LECs, the LECs billed their end users. The LECs paid the Debtors on account of all of the aggregate billing transactions the Debtors submitted during a certain period based on each LECs formulas, lag periods, and offset rights. Upon receipt, the amounts paid by the LECs become the Debtors property. The Debtors comingle all funds received from the LECs into one bank account.

Over the course of approximately 60-90 days after submitting the billing transactions to the LECs, the Debtors determine the amounts owed to each Service Providers. The contracts between the Debtors and Service Providers set forth detailed formulas for computing the amounts that the Debtors are required to pay the Service Providers. For example, the Debtors are authorized to withhold amounts to resolve disputes, its fees, and other adjustments. Due to the structure of the transactions and the fact that the Debtors comingle the proceeds received from the LECs, the Service Providers have only an unsecured contractual right to distributions from the Debtors under

the contract between the Debtors and the Service Provider. Thus, there are no liens or encumbrances on the Debtors' cash on hand, except for the BOA lien.

**II.     Locations of the Debtors' Operations and whether Leased or Owned**

The Debtors' corporate and administrative offices are leased and located at 5000 Sawgrass Village Circle, Suite 2, Ponte Vedra Beach, Florida 32082. Operations facilities for the Debtors payment processing business are leased and located in Ft. Lauderdale, Florida. The Debtors also have a small leased space near San Antonio, Texas where it keeps some of its servers and computer equipment used in connection with its business.

**III.    Reasons for filing Chapter 11**

AT&T and Verizon are the largest of the LECs through whom the Debtors' payment processing business bills merchants' services to end users. In 2012, these two companies made decisions to settle various class action lawsuits and discontinue billing of any services except wireline telecommunications services. The LECs agreement to eliminate billing for non-telecommunication services left only wireline telecommunications customers, whose industry was in rapid decline. Consequently, the total billings of third party payment processors like the Debtors declined dramatically. In addition, under the terms of the billing agreements with the LECs, the costs of any settlement had to be paid by payment processing companies, such as the Debtors, and their customers. The administrative costs of the class action litigations, which were handled entirely by AT&T and Verizon, were significantly higher than anticipated, thus reducing dramatically the funds available to reimburse customers for reserves taken by AT&T and Verizon from the remaining active customers. With substantially lower billings and increased administrative costs, the Debtors' cash flow from their payment processing business declined approximately 76% from fiscal year 2011 to fiscal year 2016. Then, in early 2017, Verizon

discontinued billing for all of the Debtors' Service Providers. These developments left the Debtors with significant reserves owed to customers and no realistic way to ever pay them back.

While dealing with the challenges related to the payment processing business over the course of the past two years, the Debtors were dealt another blow in connection with its customer service center business in late 2015 when the Debtors' largest customer service center customer took their call center business in house. Thereafter, in the beginning of 2017, the Debtors received notice from their largest remaining customer service center customer that it would be terminating its contract with the Debtors in 2nd quarter 2017. Saddled with large debt obligations to BOA, the Debtors were unable to raise new capital to grow the existing customer service center business. Likewise, efforts to sell the customer service center business were unsuccessful and the Debtors ultimately decided to simply wind down the customer service center business.

As mentioned above, the Debtors were successful in selling their conferencing services business for approximately $3,700,000, but all of the net proceeds were paid to BOA and were not available to invest back into the business.

Since selling the conferencing services business and winding down the customer service center business, the Debtors have been working with BOA and other creditors to develop a restructuring and/or liquidation framework that will maximize value to all creditors. Various creditors have shown an interest in acquiring the payment processing business, but no sale of the payment processing business can be achieved without eliminating the substantial reserve debt from the books of the company.

IV.    **Ownership Interests in Debtors, Management of the Debtors, and the Debtors' Officers.**

The ownership of each of the Debtors is listed below.

6

a. Holdings is a Delaware corporation formed on or around October 5, 2001. Holdings has two types of equity ownership interests: (1) common stock; and (2) series A preferred stock. The common stock is owned by approximately one hundred (100) shareholders, with the largest shareholder holding approximately 18% of the outstanding common stock. The preferred stock is owned by approximately sixteen (16) shareholders, with the largest shareholder holding approximately 42% of the outstanding preferred stock.

b. ILD is a Delaware corporation formed on or around April 18, 1996. Holdings owns 100% of ILD.

c. Teleservices and Intellicall are Delaware corporations formed on or around January 10, 2005 and December 28, 1987, respectively. ILD owns 100% of Teleservices and Intellicall.

Traditionally, Holdings had several directors that managed the affairs of the Debtors, but in an effort to eliminate costs only Mr. H. Edward Brooks currently serves as a director of Holdings. Mr. Brooks also serves as Chief Financial Officer of the Debtors. The Debtors have no other officers as of the Petition Date.

## V. The Debtors' Gross Annual Revenues

The Debtors' approximate gross annual revenues for fiscal years 2015, 2016, and year-to-date 2017 are listed below.

| | |
|---|---|
| Fiscal Year Ended 9/30/2015 | $20,948,000 |
| Fiscal Year Ended 9/30/2016 | $14,379,000 |
| Fiscal Year 2017 Through June 2017 | $ 8,368,000 |

## VI. Amounts owed to Various Creditors

As of the Petition Date, the Debtors' primary secured creditor, Bank of America, N.A. ("BOA"), was owed approximately $5,625,000. BOA's claim is secured by a first priority, blanket lien on substantially all of the Debtors' assets.

The Debtors are not aware of any priority tax liabilities that are currently due and owing.

The Debtors believe that they have unsecured debts in the approximate amount of $26 million dollars.

**VII.  General Description and approximate value of the Debtors' Current and Fixed Assets.**

The Debtors do not have current appraisals or valuations of many of their assets. The Debtors provide the following good-faith estimates of the value of their assets in accordance with the Court's requirements for the Case Management Summary.

The Debtors estimate that their fixed assets have minimal value. The net book value as of June 30, 2017, was $122,000.00. Approximately half of the fixed assets are comprised of leasehold improvements.

The book value for the Debtors' current assets was $5,139,000 as of June 30, 2017. The Debtors estimate that the approximate value of the current assets is $3.3 million reduced by the deferred taxes of approximately $607,000.

**VIII.  Number of employees and gross amounts of wages owed as of petition date.**

As of the Petition Date, there were approximately eleven (11) employees that continued to operate the Debtors' business and collect accounts receivable.

**IX.  Status of Debtors' Payroll and Sales Tax Obligations.**

As of the Petition Date, the Debtors believe they are current on all payroll and sales tax obligations. The Debtors utilize an outsourced payroll vendor, ADP, to handle all payroll deductions.

**X.  Anticipated Emergency Relief to Be Requested Within the First 14 Days after the Petition Date.**

The Debtors anticipate filing the following emergency motions:

   a.   Motion for Joint Administration; and

      b.     Motion to Use Cash Collateral.

**XI.   The Debtors' Objectives.**

The Debtors filed these Chapter 11 cases in order to maximize the value of the Debtors for all parties in interest. The Debtors intend to continue operations of the payment processing business while finalizing a plan that allows for the sale of the payment processing business as a going concern.

Respectfully submitted this 29th day of September, 2017.

    /s/Jimmy D. Parrish  
    JIMMY D. PARRISH, ESQ.  
    Florida Bar No. 526401  
    jparrish@bakerlaw.com  
    WENDY C. TOWNSEND, ESQ.  
    Florida Bar No. 517951  
    wtownsend@bakerlaw.com  
    ANDREW V. LAYDEN, ESQ.  
    Florida Bar No. 86070  
    alayden@bakerlaw.com  
    BAKER & HOSTETLER LLP  
    200 South Orange Avenue  
    SunTrust Center, Suite 2300  
    Orlando, Florida 32801  
    Telephone (407) 649-4000  
    Facsimile (407) 841-0168  
    *Proposed Attorneys for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| **ILD CORP.** | CASE NO.: 6:17-bk-03506-PMG |
| **ILD HOLDINGS, INC.** | CASE NO.: 6:17-bk-03507-PMG |
| **ILD TELESERVICES, INC.** | CASE NO.: 6:17-bk-03508-PMG |
| **INTELLICALL OPERATOR SERVICES, INC.** | CASE NO.: 6:17-bk-03510-PMG |
| Debtors. | |
| _____/ | |

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on September 29, 2017, I electronically filed the foregoing *Case Management Summary* with the Clerk of the Court by using the CM/ECF system which will provide a Notice of Electronic Filing and copy to all parties requesting such notice and/or via U.S. First Class Postage Prepaid Mail or email to the following:

Bank of America, N.A.
Stephen E. Gruendell, Esq.
Moore & VanAllen
100 North Tryon Street, Suite 4700
Charlotte, NC
stevegruendel@mvalaw.com

Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801

Global Tel Link
John Hutton, Esq.
Greenberg Traurig, P.A
333 S.E. 2nd Avenue
Miami, FL 33131
HuttonJ@gtlaw.com .

Debtor's 20 largest unsecured creditors as indicated on the mailing matrix attached to the original of this Motion and filed with the Court

<u>Jimmy D. Parrish</u>
JIMMY D. PARRISH, ESQ.

BBG Communications
Brian Rhys
1658 Gailes Blvd.
Suite B
San Diego, CA 92154

Bizzlinks.com
630 Freedom Business Center
Third Floor
King of Prussia, PA 19406

Century Link
Kelly Taylor
100 CenturyLink Drive
Monroe, LA 71203

Combined Public
Aqua Drive
Cold Spring, KY 41076

Communications Network Billing
Cristina Tucker
19992 Kelly Road
Harper Woods, MI 48225

CustomTel
Vickie Crowder
6242 W. Desert Inn
Las Vegas, NV 89146

Directory Billing Services
Brad Daniel
3860 W. Commercial Blvd
Fort Lauderdale, FL 33309

Embarq
Darlene House
2201 Brentwood Road
Suite 107
Raleigh, NC 27604

Family Contact 911
Nikolaos Spiridellis
170 Sand Key Estates Drive
Clearwater Beach, FL 33767

Global Tel
Margaret Phillips
2609 Cameron Street
Mobile, AL 36607

Host A Web
c/o Unique Web Listing
273 Walt Whitman Rd
Suite 374
Huntington Station, NY 11746

Infinity
Travis Torreyson
8500 Shoal Creek Blvd
Building 4, Suite 100
Austin, TX 78757

Local Biz USA
Pat Giglio
One Orient Way
Suite F336
Rutherford, NJ 07070

Local Internet Listings
c/o Unique Web Listing
273 Walt Whitman Rd
Suite 374
Huntington Station, NY 11746

Members Edge
One University Plaza
Suite 307
Hackensack, NJ 07601

Net Zero
Vikram Anand
21301 Burbank Blvd
Woodland Hills, CA 91367

OnLine Yellow Pages
Brad Daniel
8751 West Broward Blvd.
Suite 307
Plantation, FL 33324

Optic Internet Protocol
Gregory Alpow
3050 Royal Boulevard South
Suite 165
Alpharetta, GA 30022

Small Business Technical Solutions
John Peacock
929 North Plum Grove Road
Schaumburg, IL 60173

Zoom-I-Net
Maria Gomez
198 N. Ridge Drive
New York, NY 13036